The United States Court of Appeals for the Federal Circuit is now open and in session. God Save the United States and this Honorable Court. Good morning everyone. The panel has reported a total of five cases. Two of them will be submitted without argument today based solely on the briefs. Those are Appeal 3230 Broad v. Merit System Protection Board and Appeal 3285 Madison v. Department of Defense. On the three case argument list we'll hear argument first in Appeal 1016 Deere & Company v. International Trade Commission. Mr. Smith, good morning to you. Welcome to the court and please proceed. May it please the court, I am Lloyd Smith here on behalf of Appellant Deere & Company. In order to protect U.S. consumers, Deere respectfully asks this court to overturn the ruling in the commission for several reasons. First and foremost... Do we know the total number of sales in the U.S. of the European version harvester that are attributable to Deere? No, I'm sorry, let me restate it. Do we know the total number of sales of either type of harvester in the relevant period that are attributable to Deere? Yes, Your Honor, we do. What is the number? I assume when you say either type of harvester you mean... The U.S. or the European, yes. Yes, the approximate number of North American version machines is 4,400. Deere contends... What's the total of both types? The total of both is 4,400 plus the 32 that we believe were authorized by Deere if you assume that authorization occurred. Yes, I'm assuming that authorization occurred. Yes, Your Honor, then the number would be 4,432. And that's what you think should be the denominator. This is a denominator question, isn't it? Yes, Your Honor, this is most certainly a denominator question. And there's an admission that something like 131 sales of the European version are attributable to Deere? There's no admission from Deere. Deere's number is 32. There is a difference of opinion as to what the number in the numerator ought to be. What's the alternative arguable number? The alternative arguable number, the highest number that's been submitted, is the Commission's number of 141. So then the numerator, as Judge Lurie correctly says, this is a numerator-denominator issue, then the numerator at the highest would be 141 over 4,400. Yes, Your Honor, if you include a numerator of 141, then the denominator must also include that 141. That should be added to the North American machines. I can't do the math in my head, but that's a very tiny percentage. Yes, Your Honor, it's less than three percent. The question is whether substantially all of the sales by Deere are of the American version as opposed to the European version. That's right. We believe that is very squarely the issue, and under the percentages that we just laid out, the 141 over approximately 4,500, it would be less than three percent, which is well within the Warner and Lambert 4.4 percent approval from the Second Circuit. But the Commissioner used a different denominator, and that's the question, isn't it? Yes, the Commissioner substituted what we would view as a very radically different test. They did not apply the all is substantially all test that this course set forth in SKF. Their test is entirely different. What about Boudreau, the prior appeal in this same proceeding? I'm sorry, Your Honor. Was the Commission's decision consistent with our remand instructions in the Boudreau case? No, Your Honor, it was not, because the Boudreau case applied or instructed the Commission to apply the SKF test, the all is substantially all test, to this case. Instead, they substituted their own test, which ignores the North American virgin forage harvesters sold by Deere in this country, or Deere's independent dealers. Mr. Smith, when this case was here before, there was emphasis that these were used harvesters that were being imported. But in the briefing now, I don't see any distinction being drawn. Was that because we're supposed to remember that they were used, at least at the time of our prior decision, or is your position that it doesn't matter? No, Your Honor. Our position is that it's very critical that these are all used machines. Used machines are what is at issue in this case. All of the European virgin forage harvesters are used machines. If, for some reason, the court would decide that used machines don't matter, then the numerator would have to be zero, because all of the machines, the gray market machines being imported into the United States, are, in fact, used machines. Okay. What about the authorization issue? Well, the Commission heralded two respective... I take it you don't need to win the authorization issue to prevail in the case, because even with those sales authorized or deemed to be authorized, you still win under the 4% versus 3% math. Assuming you win. That's right. I mean, that issue is dispositive. We agree with you 100%. But if you don't win on the denominator issue, we have to reach authorization, don't we? If we don't win on the denominator issue, we do have to reach authorization. But we would also contend that you would have to create a new test instead of the SKF test that you recently created. In order to apply the Commission's test, you have to come up with an entirely new test. The Commission's test does not comport with the All or Substantially All test. We do that all the time. Of course. And, of course, that you're right. But just to be clear, the Commission's test is not the All or Substantially All test. But if we win on the numbers, and we feel certain that we do win on the numbers, based on your opinion in SKF and how you applied it to this case in Bordeaux, then you do not need to reach any of the other issues in this case. Even if you take into account the European machines sold by the European dealers in the numerator, which we contend do not belong there. And is that based on the Second Circuit case, or do we have to deal with issues such as likelihood of confusion, which is what trademark infringement is all about, right? Well, for the purposes of this appeal, you don't have to deal with likelihood of confusion. But I do think that confusion is an important issue that weighs on the authority standard, if you'd like me to address the authority standard as well. The Commission improperly applied an apparent authority standard when they should have applied an actual authority standard. The actual authority standard takes into account the knowledge and intent of the trademark owner. But why doesn't apparent authority relate to likelihood of confusion? If something appears to be a certain way, then there might be confusion. Well, assuming arguendo that it does, the Commission still misapplied the apparent authority standard. They did not focus on consumers' perceptions. They focused on the perceptions of the respondents, of the infringers. Yet the Commission invoked an apparent authority standard because of the consumer protection, consumer focus of the trademark law. And they ignored the evidence in the record about what consumers perceived about Deere's dealers' lack of authority to service and handle these machines. What's the basis of saying apparent authority shouldn't be considered? The basis for that is the level of intent and knowledge required to hold the trademark owner responsible for the actions of third-party independent dealers. We contend that authorization, as stated in Bordeaux... No, but if the... I think Judge Lurie has a very powerful point and it seems to me you're not really meeting his point. His point is that where you're talking about likelihood of confusion, you're talking about perceptions. And when you're talking about perceptions, that seems to point toward apparent authority rather than actual or explicit authority. The reason we advocate the actual authority standard is because SKF talks about the quality control procedures of the trademark owner. And that necessarily includes the knowledge and intent of the trademark owner. The apparent authority analysis conducted by the Commission was about Deere's reactions to the infringements problems created by others. SKF is a very different case. In SKF, that trademark owner intentionally chose to distribute alternate gray market goods in order to maximize their profits. It's right there. This is a very different case from that. There is no evidence that Deere ever intentionally chose to distribute in the United States gray market machines. Instead, the evidence relied on to find apparent authority was all evidence of Deere's reaction to the problem created by third-party infringers. And... Well, that's not completely true. There was some financing done by a Deere affiliate. Well, Your Honor, our response to that would be that that was, again, we lack knowledge and intent of that financing. And there's nowhere in the law... Why isn't the activity of the subsidiary attributable to Deere? The financing arm of Deere belongs to Deere. So why isn't Deere stuck with whatever its financing arm does? Thank you, Your Honor. The answer to that question is the financing subsidiary of Deere is very separate and distinct from the agricultural division of Deere, which is distributing the goods in question. The ALJ had significant findings about the separation of personnel, computer systems, physical offices. John Deere Credit itself was not aware, due to the 350,000 transactions it conducts a year, of the 20 that slipped by for gray market goods. Mr. Smith, on the question we were discussing before, the denominator question... Yes, Your Honor. What's the standard of review? Is that practical law? It's a legal question, Your Honor. And I think that's an important issue as well. It's a legal question. Because they misapplied the legal test. I see here that I'm in my rebuttal time. One brief question, Judge, just to confirm. All of these products were manufactured in Germany, is that correct? Or by a... Overseas, they weren't exported and re-imported, is that right? I believe that the 6,000 series were all manufactured in Germany. But the 5,000 series was exported and re-imported. Okay. Thank you. All right, you've got four minutes left for rebuttal. So we'll hear now from the other side. First from counsel for the private party. No, the commission. No, Your Honor, the international trade commission. Please proceed. Thank you, Your Honor, and may it please the court. I want to make clear up front that the discussion of the numbers, the numerator, the denominator, that calculation is, in fact, an alternative holding by the commission. The dispositive holding, and it's easy to miss in the opinions at A22 to 24, was that Deere failed to present evidence about its relationship with its official European dealers. And because of that, the commission presumed that those sales by those dealers were, in fact, authorized, as instructed by the court in Bordeaux. Deere also failed to establish the number of sales, and because of that, the commission... The numerical question would move the authorization question, right? Well, Your Honor, this is an alternative holding, both with regard to the numerical and the authorization question. The commission presumed, because Deere did not present any evidence about its European dealers, official dealers, the commission presumed that they were authorized, and because there was no information about the European version harvesters that were sold, provided by Deere, the commission made an adverse inference that those numbers were sufficiently high. And because of that... Say again? That the numbers were what? That they were sufficiently high that not all or substantially all of the sales were North American version harvesters. What number was high? What number was presumed to be high? The number of sales by authorized Deere dealers of European version harvesters was sufficiently high that not all or... I thought the number was known. It didn't have to be guessed at. No, Your Honor, it wasn't known. Deere never provided information about its European version harvesters sold by its European dealers. That's what the commission found. The commission did an alternative holding based on information provided by respondents. We don't know the number that were imported? No, Your Honor, that's an estimate that the commission determined, and the alternative based on the record evidence provided some by Deere about their U.S. dealers, but they provided no information about their European dealers. So the commission combed the record and looked at information provided by respondents about purchases that they had made from Deere's official dealers and attributed those to those numbers and then said even if we just look at those limited numbers, which are conservative in estimate, that those numbers are sufficiently high, again, that not all or substantially all of the sales were North American versions. Well, wait a minute. I can't follow you here. You say those numbers are sufficiently high. They're the same numbers that Mr. Smith was talking about, which he says calculate to 3%, against precedent saying 4% is still substantially all. Your Honor, those numbers were provided in part by respondents with regard to the Europeans. We have two different official dealers here. Before you finish Judd and Cheryl's question, all these numbers we're bandying around, are they supposed to be confidential? Yes, Your Honor. They are, I assume, because Deere discussed them in the open forum that those numbers are public at this point. They're public at this point. Okay. So the bracketing and the briefs we can ignore. I think at this point we have to, Your Honor, so we can discuss this case. We have to because we've talked about them. We have to because even before you came here, they were no longer confidential. No, Your Honor. We've decided that in order to inform the court, we'd like to discuss the numbers openly. Okay. It would have been useful to have told us that before argument. And, Your Honor, what was particularly striking to the commission was that the number of European version harvesters that were sold was approximately the same as the grain market harvesters that were sold. And so Deere was contributing to the confusion that it was complaining about. And it was contributing approximately the same amount, if not more, to that confusion. Why is that relevant under the case law? Well, that's relevant because under Bordeaux, the court said that to permit recovery when less than substantially all of Deere's goods or North American version harvesters would allow the trademark owner to contribute to the confusion by consumers that it accuses the grain market importers of causing. And they claimed that these grain market imports had risen to the level that they were intolerable. And so then to say that their own sales, which were at the same level, is just a small amount, in this particular case, they would have to be intolerable as well. And they would show, as the commission found, that not all or substantially all of the sales were North American version harvesters. Whew. I'm having a lot of trouble following the logic of what you're saying. I mean, I think what was particularly striking to the commission was that Deere was causing... You seem to be arguing that properly read, Bordeaux and SKF, for numerator and denominator, require you to compare the alleged grain market sales with the sales of the complaining party, in this case, Deere. His argument is, oh no, under SKF and Bordeaux, it's exactly the opposite. You don't look at that as the denominator. You look at the total sales of both types of goods. Your Honor, the commission argues that we should take into account all of these numbers, that there is no particular calculation that we need to put a particular numerator over a particular denominator. The commission was aware of the number of sales, the 4,400 sales of North American version harvesters in the United States. The commission was also aware of... The question isn't whether the commission was aware of it. The question is whether that's the required calculation in the case law. Well, Your Honor, I don't believe that the case law has set out a required calculation. It said if the sales of the authorized dealers are sufficient in number to show that not all or substantially all of Deere sales were North American version harvesters. Whoa, whoa, whoa, wait a minute. When you say North American version harvesters, it seems to me the clear implication under the case law is that you look at all the sales of every type. Of the sales that were not materially different. No, you look at all the sales. Right, Your Honor, and the commission did look at all of the sales. The commission looked at the number of sales by the authorized U.S. and European dealers, looked at the number of sales... You're saying that the case law has never indicated what the denominator is. Mr. Smith argues that the case law clearly indicates that the denominator is all the sales, in this case by Deere. My recollection of the case law is that he's right, and you're saying no, that isn't what's required because the courts never said that, and therefore the commission was free to do any calculation they wanted to do. No, Your Honor, I'm saying that the commission followed the standards set out in Bordeaux to determine whether all or substantially all of the sales were not materially different. And in doing so, the commission considered not only the numbers of sales by the authorized dealers, but also the total number of European version sales, as well as the total number of sales by Deere in the U.S. and North American version harvesters, and considered the totality of these numbers and coming to the conclusion... I think the answer is almost the same, whichever way you do it. I mean, if this is something that needs to be clarified, we can certainly do so. But in either case, whichever numbers you use, the result is less than the 4% of precedent, is it not? Significantly less. Your Honor, I think that if you do the calculation that Deere is suggesting, then they come to a 3% number. But the fact of the matter is that Deere did not provide the commission with the evidence that it needed to even do this calculation. Well, they provided numbers. Doesn't the burden shift to someone? The numbers on their face are credible? Your Honor, that would then be placing the burden back on respondents, which is exactly what this court said should not be done. That Deere has the burden of coming forward with the information without authorization. They did not, Your Honor. They did come forward. The commission says... Wait until the question is finished before the answer begins. This is what I really... They did come forward with numbers. And the commission, as far as I can tell, said, oh, we think that's low. Your Honor, the Deere came forward... They were... Discovery was available and every other method that there are attorney obligations of correctness. There are party obligations of not to deceive. And as far as I can tell, all the commission said is that, well, it looks low to us. No, Your Honor, the commission... Deere came forward with numbers about its U.S. dealers. The commission found that Deere did not come forward with numbers about its European dealers. And that because of that, the commission presumed that those sales by those dealers, those European dealers, were also authorized. But not only the U.S. The question was importation, is it not? Authorized for importation, not whether they're authorized to sell to a customer who comes in with cash in hand in Germany. Correct. The question... Yes. The question is whether they were authorized to sell the European version harvesters in the U.S. to U.S. customers. And they did, in fact, do that. But the commission found that they did not present evidence about the numbers. In fact, the commission specifically asked in our notice whether those dealers were authorized and the quantum of sales that were made by those European dealers.  So the commission was left without any numbers and therefore had to presume that they were authorized and presume that they failed to meet their... Excuse me, did not presume, but that Deere failed to meet their burden of showing that all or substantially all of the sales were materially different. And that was the commission's dispositive holding. These numbers go to the alternative holding. And, Your Honor, I see I've gone over my time. Don't go anywhere. You're arguing that there are two independent, correct, sufficient holdings in the commission decision? Your Honor, I'm saying that there was the dispositive holding that Deere did not present sufficient evidence. And that is the dispositive holding by the commission. The Federal Circuit can affirm the commission on that basis alone. The commission went on. It did not need to. But it went on to comb the record extensively. Why do you say that one of two holdings is dispositive? By definition, a holding is a disposition. So if an opinion has two holdings, then they're both dispositive. Your Honor, I'm saying that it's dispositive because it is the holding that on its own disposed of the case. That the commission then alternatively went on. It did not have to. So the commission could have stopped there and just said, Deere did not present sufficient evidence. We presume those sales are authorized. They did not meet their burden. So if you're correct, then in order to alter the commission's ruling, we would have to overrule both of those holdings? Correct. Yes, Your Honor, I believe that's true. Now, help me with this hypothetical. If I have total sales of a product here in the U.S. of 10 million. And in addition, I sell 10 products that equate to the accused gray mail products. And other people sell an additional 10. In trying to decide whether substantially all of my sales are of proper products, not gray mail type products. It seems like the denominator has to be a million and 10. But what you seem to be saying, no, the commission can ignore the million sales. And only look at the 10 gray market sales and the 10 imports of gray market products by others. And say, well, that's 100%. Your Honor, I think that's an excellent question. And the commission would look at all three of those numbers. Would not look at the numbers in a vacuum. Because I don't think that gives the complete picture. And I don't think that the Federal Circuit has said that there is a bar over which, you know, a set number over which. But when you say look at all three numbers, I don't understand what that means. If what we're trying to figure out in my hypothetical is whether nearly all of my sales are what I'll call legitimate. We've got a million that are legitimate and 10 that are not legitimate because they're of the same product as the gray market goods. Your Honor. So I don't understand what you mean when you say, well, we look at all three numbers. We look at the 10 gray market imports. We look at the 10 that I sold of the same product. And we also look at the million. How are you computing then? If you're looking at all three numbers, what's your computation? Your Honor, I think it's important the amount of confusion that the trademark holder itself is causing. They're complaining about these gray market goods, but it's difficult to parse out. In my hypothetical, I'm causing just as much confusion as the people whose imports I'm challenging. Correct. So under your view, you wouldn't look at the million. You'd only look at the 10 versus the 10. And you'd say, Michelle is causing as much problem as the gray market people, so the heck with them. Well, I think it's important... Then you're not looking at all three numbers. You're only looking at two of the three numbers. No, Your Honor. I believe that we are looking at all three numbers, but I think it's important because it's difficult... In what sense are you taking into account the million sales? Well, Your Honor, in this particular case... No, no. In my hypothetical. Well, in your hypothetical, I think you might have a different case where you have a high volume number of sales. In this particular case, we have a low volume of sales. Why do you call 4,500 a low volume? You're talking about, as opposed to SKF where you have ball bearings, and you're talking about millions of ball bearings that are being sold. 4,400 is a small number. These are large machines. They're very expensive. That's why you would expect the number to be smaller than in the case of ball bearings. That doesn't help me at all. It's a large number in relation to 141. Your Honor, it's not a large number when you consider the fact that they are causing the same amount of confusion that they're complaining of, and it's difficult to parse out when you're looking at the consumer and they're confused. Are they confused because of Deere's sales, or are they confused because of the gray market goods sales? I'm afraid there's confusion here, and not just a likelihood. Well, I apologize, Your Honor, but the commission did take from the Federal Circuit's opinion where it talks about confusion by the trademark owner, and considered that when it was looking at the totality of the circumstances and coming to the conclusion that Deere did not meet its burden in establishing that all or substantially all of those sales. I wasn't being critical. I think that the facts are confusing. Yes, no, and I appreciate it. The issues are confusing. They said that these numbers of gray market sales were intolerable, and then to turn around and say, well, but our sales are in the same number. They're small. They're minor. They're not minor. They should be equally as intolerable. So the commission's position is that it's totally irrelevant whether there are any significant differences between the products. Is that right? It's irrelevant whether consumers may or may not be confused or deceived. Is that right? As long as we use the arithmetic that you're proposing. Your Honor, the Federal Circuit held last time that there were, in fact, material differences, and there has never really been a question of whether there was confusion. Deere's never argued that there wasn't confusion. In fact, to show that the gray market sales infringed, they would have to establish confusion, consumer confusion, to establish trademark infringement. Well, because they came up with what looked like a straightforward, objective way of settling the differences without evaluating how many people were or were not confused, if there were a basis of doing that, or how many people may or may not have called upon a Deere U.S. warranty that they weren't entitled to. Or the other things which have arisen in gray market cases. So on the commission's position, that doesn't matter. Well, Your Honor, if they continue to sell these, we'll say non-conforming goods, then those attributes at some point become attributed to the mark, and they in some ways almost become genuine goods. And then it doesn't matter. It sounds to me like you're saying the commission rightfully imposed an equity-type test, that since Deere caused part of the problem, that it doesn't matter whether they were otherwise entitled under the law to the benefit of exclusion orders. They should be punished for their own bad behavior. And that has a certain logic to it. But the commission isn't a court of equity that can make up rules about unclean hands. No, Your Honor. The commission is required, as I understand it, the scheme to follow the statutes and the case law interpreting the statutes, and it has no independent authority to punish or deter bad actors or bad actions by saying, well, if you hadn't done this, you would get an exclusion order. But because you did these bad things, you're not going to get an exclusion order, even if you were otherwise entitled to it. What's the basis of commission authority to do that? The commission was looking at the 141 sales to see whether those were sufficient in number that not all or substantially all of the sales were materially different. And the commission looked at that number and said, yes, that number is sufficiently high. Compared to what? Compared to the total number of sales, the 4,400 plus the 141. The commission- Well, how can it be sufficiently high if it's 3% and the precedent says 4% isn't enough? Your Honor, let me address that precedent. That was a preliminary injunction. You're talking about Warner-Lambert. That was a preliminary injunction case where the court compared the harm to the plaintiff, which was unquantifiable, to the harm to the defendant in deciding whether to do a preliminary injunction. The court looked at that 4.4% number and said that that was a triable issue of fact and was not a set or determined number. And didn't- I was in a footnote. It wasn't even necessarily considering whether to grant a preliminary injunction. Maybe there's more harm to bring in a product that doesn't have the safety features, that doesn't have the warranting, that doesn't have instructions in English, and all the rest of it, and to cast that out on the bargain-hunting public. I think that's a fair point, Your Honor. Thank you. That's the commission's position. Yes. No harm. No harm. They're saying it doesn't matter if there's any harm. To- To deer. To deer. To deer or to the public. Either way, to bring in products without safety features, without instructions, without the warranty that a purchaser of a used harvester might expect carrying the deer trademark. Well, Your Honor- We're not talking about the territorial aspects of trademarks. That was set aside in our prior decision. Correct. So you're saying none of this matters, right, as long as 3% is considered trivial. Your Honor, I think that, you know, to the extent that that does matter, the increased safety features, that that is something that deer themselves are guilty of, that they're bringing in those machines as well. I'm sorry, did I hear you say deer is importing used or new European- Version harvesters. Harvesters. Yes, Your Honor. Without the safety features that are required in the United States? Yes, Your Honor, through its channeled authorized European and U.S. dealers. Are they materially different? Do you recall that in the record? From the U.S. versions, they're the same as the grain market goods, Your Honor. So, yes, they are materially different. And that was settled in the Bordeaux case previously because those are being reimported as well. Those are deer's own sales. And that, Your Honor, brings me back to the original point is that the commission found that deer didn't present the evidence that the commission needed to make this calculation and didn't present these European dealer- information about its European dealers for the commission to make the determination. And so, you know, getting into these numbers, you know, I think it is important. But the dispositive holding and I think that the Federal Circuit, I hope that they consider, you know, whether deer presented sufficient evidence and whether the commission properly presumed that they were authorized. You mean we rather than they? Yes, Your Honor. Thank you very much. And I'll apologize for going over my time, but leave any time for the interveners. Thank you. Mr. Miranda, before you begin your argument, can you help me understand the practicalities here? We're talking about an order to exclude some imports, right? That's the basic background here? Yes, Your Honor. And we're talking about a five-year period that ended in 03, I think? Yes, Your Honor. Now, whatever the exact number of the imports were, whatever happened to them? Where are they today? After the exclusion order was vacated by this court? Well, where are they today? They're out in commerce. So they've been sold and they're on somebody's farm being used to create silence? Yes. So does that mean it's a moot point whether there should be an exclusion order? Let's assume we determine that there should be an exclusion order. Of course, I don't know what we're going to determine. But if you assume we determine there should be an exclusion order, if they're all already sold in domestic U.S. commerce and they're out on farms, then why isn't the whole case moot? Well, I think that there are still situations where the used harvesters are being bought and sold as any used vehicle. Yes, but they can't be excluded any longer. They maybe are being sold by somebody in Iowa to somebody in Kansas. But it seems like under the scheme, what counts is at the border. Once they've crossed the border and not been excluded, it looks like it's too late. Well, where am I wrong on this? You're not wrong, Your Honor. I believe that the importance of the issue as it pertains to the clients has diminished and perhaps as it pertains to deer has diminished. But there are still harvesters that could be exported into the United States or Germany. Not in this period. We're talking about a five-year period that's long in the past. Right. All of those harvesters are too late to exclude, right? Yes. We're not talking about future harvesters. That will have to be some future proceeding. There could be used 6,000 harvesters that are exported into the U.S. In some later time period. Right. It would involve a separate proceeding. But the exclusion order actually went on in perpetuity with respect to the importation and sale. I agree with you, Your Honor. The impact has diminished over time. Why is there any? Because there's still used 6,000 harvesters in Europe that could be imported into the United States. And the respondents in this case could have harvesters that were to be sold in the U.S. They would not be allowed to sell them under the exclusion order. If they had a harvester on their farm, they would be prohibited from selling them. I see. So the importance has diminished. I think what's important here, and you've touched on, I think, on some issues that I'd like to address, the all is substantially all standard, I think, Your Honor, has articulated it correctly. It's the number of European harvesters that Deere has authorized or sold in the U.S. over the total number of sales by Deere. Not according to the commission's counsel, who cites Boudreaux as her authority for a different denominator. In the commission's decision, the commission- She quoted language from Judge Clevenger's opinion on behalf of the court. So what do you do with that? That's actual language. I don't disagree with the language from the court, but I believe that the standard was, the proper standard was, in fact, applied by the commission. What the commission said was Deere did not meet their burden of proof in establishing what the numerator should be. We're talking now about a number, 141, but Deere said there's possibly 100 more European harvesters that they can't say whether they were involved with them or not. So the number is 141, perhaps up to as high as 241. Okay, let's take 241. Okay. What difference does it make? Well, the difference it makes is that the all or substantially all standard cannot be fully addressed by the commission if we don't know what those numbers are. If you look at the 241 as the numerator and the sales and the record in the denominator, which is 1,100 new ones plus the 241 used ones that there's proof of, we're only looking at about 1,300. Boy, this is getting more and more confusing. Opposing counsel says 4,500 or some such number. You're saying 1,300. Can't we agree on anything here? Unfortunately, Your Honor, the burden is on Deere to come forward and show the precise numbers. I'm sorry. Well, of course the burden's on Deere. That part isn't disputed by anybody. And the problem that we're having here is that Deere did not meet its burden of proof of coming forward with the full quantum of numbers. And the commission looked at the proof in the record, and they made a determination that Deere did not prove the numbers in the numerator that they were responsible for, that there was a presumption that they authorized, that the information was in their control, that they did not come forward with the full quantum of what those numbers were. So it's impossible then to apply that standard. What the commission did... I don't understand what you're saying. Are you saying that because Deere didn't prove what all of its European dealers did, that the commission would be entitled to assume that the number of authorized sales was a million? Not 300 or 200, but a million, because of the absence of proof. The absence of proof would justify an assumption of any number. That seems to be what you're saying, but I'm... It doesn't justify any number, Your Honor, but I think what the commission was saying was that Deere did not meet its burden in establishing the quantum of harvesters that are coming in. You can't just come in and say, well, these are the only ones that respondents were able to bring up, so that's the number that we're going to use. Deere had a responsibility to come forward with what the commission would think would satisfy the standard. The commission... That's a factual issue for the commission to determine what those numbers are, and the commission said, here, we can't determine that, because Deere did not come forward with the rest of the numbers. Therefore, we're entitled to what? We're entitled to say that Deere did not meet their burden of proof. That's what they're entitled to say. So then the scope of the burden of proof is to prove the denominator. Both the numerator and the denominator. The scope of the burden of proof is to prove both, and the burden is on Deere. That information is uniquely in Deere's hands. Why do you say that? These aren't subsidiaries of Deere. Yes, they are. They're authorized dealers of Deere. An authorized dealer is not the same thing as a subsidiary. Look, if I'm a corporation and I have 50 subsidiaries selling things in a foreign country, of course I control them. I can fire all their employees. I own the records. Of course I can be held to be responsible to produce that information. But if I authorize an independent corporation that I don't control to sell my products, I don't own their records. I can't fire their people, and I can't force them to give me their records. Can I? Two things with respect to that, Your Honor. First of all... How about a yes or no answer first? You can't force them to give you... Well, actually you can force them to give you the records. Because this is a trademark case, and these dealers were licensed to sell harvesters under Deere's trademark. And Deere has a duty... That's what an authorized dealer means. They have a duty to police what's going on in their mark. But you seem to be treating a company in Europe that's an authorized dealer as if it was a subsidiary of Deere under Deere's control as to records and information. And I'm just saying, where do you get that? Where do you get that they would be able to control the information or the records of the dealers in Europe just because those dealers are licensed, are authorized? I get that from this court's decision in Bordeaux where they said, Deere, there's a presumption of authorization. There's a presumption that those harvesters that are coming in are coming under authorized by Deere. And it's Deere's burden to overcome that presumption, and Deere did not submit the proof necessary to overcome that presumption. In this case, our position has been all along that the respondents are not doing anything differently than what Deere's dealers were doing under the penumbra of Deere's trademarks that are at issue in this case. They're being sold under the John Deere logo, the Leaping Deer logo. The Deere trademarks are on the website that are promoting these harvesters in the U.S. Deere is financing these European harvesters in the U.S. In some instances, Deere is taking a security interest in these harvesters in the U.S. Deere's dealers were buying and selling these exact harvesters to the respondents in this case. The proof that came in came from the respondents in this case. They said, look, we bought these harvesters from Deere dealers. We sold them to Deere dealers. What the commission said was, okay, there's a lot of proof there from the respondents. On Deere's side, nothing further. Because of that, the commission was not able to fully address the substantially all standard, because Deere did not submit the proof in the commission's determination sufficient for them to look at that. They were able to, at the very least, and I should point out with that numerator and denominator, with respect to the numbers that you're talking about, there is no rigid percentage test. I think this court in both SKF and Bordeaux made it clear that there wasn't a rigid test when they clarified Martin's Herod and said typically one product would not be enough. That indicates that in some instances one might be enough. Certainly not this case where we're talking in excess of 100. But this court made it clear that this is a standard where you need to look at the totality of the circumstances. And the totality of the circumstances here was that Deere was contributing to whatever confusion there was as much as the accused respondents. Thank you, Your Honors. All right. Mr. Smith, you have about four minutes for rebuttal. Thank you, Your Honor. I'd like to emphasize that Deere did meet its burden of proof in this case. There's a lot of conversation going on about how Deere failed to meet its burden of proof with respect to the numbers sold by its authorized dealers. But the ALJ recognized, as did the staff below, and the numbers that Deere came up with, which is 32 machines sold by its authorized U.S. dealers. Bordeaux does not require the commission to take into account European dealers. But even if it does, those numbers were also in the record from Deere. Deere said very specifically and put in evidence that at the time they were looking to do the safety pit on the cutterhead safety alarm, they searched for every gray market machine they could find in the United States. And they found 247 machines. The commission found, based on logic we fail to understand, that 141 of those machines were somehow sold by Deere's U.S. and European dealers. So that number is closed. There is testimony in the record that there are potentially some other machines out there. But to charge Deere with perpetually being charged with more and more investigations to prove a negative that there are no more machines out there can't be the appropriate standard. You seem to be saying the scope of Deere's burden of proof is different from what opposing counsel are saying is the scope of Deere's burden of proof. Well, what I'm hearing from opposing counsel is that the number of gray market machines in the United States and those activities of its dealers is within the control of Deere. And we disagree. There is no dispute that they are independent third parties who did not have actual authority from Deere to sell these machines. And Deere does not have unfettered access to their records. There's evidence that their activities were occurring without Deere's knowledge. So for Deere to be charged with knowing for 100% certainty whether or not its dealers were selling these machines is not appropriate. Deere put in substantial evidence... You seem to be conflating two different things. One is whether they knew or should have known, perhaps. But the other is whether they could have required the European dealers to provide the data that the Commission seems to suggest was part of their burden of proof. Well, the Commission remanded this... Take it one at a time. I will take it one at a time. Simple-minded people like me can't deal with two things mushed together. Thank you, Your Honor. The Commission remanded this matter to the ALJ with open-ended instructions to conduct proceedings consistent with the Bordeaux Opinion. Yeah, but we're reviewing what the Commission did, and they disagreed with the ALJ. Yes, Your Honor, but the ALJ... We convinced the ALJ. It was overridden by the Commission. The ALJ limited the remand to financing and gave no weight to the sales of European dealers. Why is that relevant? That is relevant, Your Honor, because... Let me finish the question. Yes, Your Honor. Why is that relevant when what we're reviewing is what the Commission did, not what the ALJ did? Well, because the evidentiary hearing was in front of the ALJ. Sure. And now the Commission is complaining that the evidence that they received is not sufficient. We disagree. We very clearly proved that we searched for and found 247 machines in the United States. The Commission believes that 141 of those machines were authorized for sale by Deere's European and U.S. dealers. So we proved a conclusive number. Yet the Commission is again saying that number is insufficient. We were never given any instructions in front of the ALJ during the evidentiary hearing to put in any different numbers. So the Commission is applying an ex post facto disagreement with our evidence without ever giving us opportunity to put in more evidence or different evidence. The ALJ did not credit European dealer sales. It was not at issue in front of the ALJ. His opinion does not credit European dealer sales. It focuses on U.S. dealer sales, which we believe is the appropriate presumption in this case. Because what? Your control over U.S. Deere dealers is stronger than your control over European Deere dealers? Because our control over U.S. dealers and European dealers ensures that products intended for the U.S. market only are distributed by Deere to U.S. dealers. And therefore, the European dealers only receive European machines. They fall outside the U.S. territorial designation of our U.S. trademarks. So to presume that dealers are physically located and have a dealer area and only receive machines intended for a foreign location, that the sale of those machines outside their dealer territory does not make sense here. It doesn't comport with the territorial nature of U.S. trademarks. It also imputes to Deere activity which it can't control. The evidence is very clear, and you asked about the general exclusion order. These machines being sold, every one of them is used, in many cases more than 10 years old. Imputing the sale of a European machine that's 10 years old or 5 years old into the United States, imputing that to Deere forces or raises the bar for trademark owners in the sense that they will be forced in perpetuity to police their marks long after the first sale of the machine has occurred. That's not consistent with the law either. Is it your position that you don't have sufficient control over either your authorized U.S. dealers or authorized European dealers to be responsible to obtain their information? We do have important quality controls in the U.S., and that is we only sell U.S. machines to the dealers. That's not the question. The question is whether the ability to force dealers to give you information is any different for your dealers in the U.S. versus your dealers in Europe. I believe that how we eventually forced our dealers to do what we wanted was by bringing this litigation. That's the ultimate quality control procedure. If you're asking whether we have the right to go and seek discovery from our European dealers, I don't know the answer to that question, Your Honor. Like the end of the license agreement? It doesn't appear in the U.S. dealer agreement. These are independent dealers that carry products from many manufacturers. In both locations? Yes, in both locations. The dealers are not required to exclusively carry Deere products. They're independent third parties. All right. Well, I think we've exhausted the opportunity for counsel to have a full say for all three parties, so we'll take the appeal under advisement. We thank all three of you. Thank you.